SANDRA R. BROWN-BODNER (SBN 157466)
Hochman Salkin Toscher Perez P.C.
9150 Wilshire Boulevard, Suite 300
Beverly Hills, California 90212
Telephone (310) 281-3200
Facsimile (310) 859-1430
Email: brown@taxlitigator.com

ERIC D. SHEVIN (SBN 160103)
Shevin Law Group
15260 Ventura Boulevard, Suite 1400
Sherman Oaks, California 91403
Telephone (818) 784-2700
Facsimile (818) 784-2411
Email: Eric@shevinlaw.com

Attorneys for Defendant
HELIOS RAPHAEL DAYSPRING

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HELIOS RAPHAEL DAYSPRING,<br><br>Defendant. | Case No. 2:21-CR-00343-AB-1<br><br>**DEFENDANT HELIOS RAPHAEL DAYSPRING'S SENTENCING MEMORANDUM**<br><br><br>Sentencing Date: May 27, 2022<br>Time: 1:30 p.m.<br>Courtroom: 7B<br>U.S. Courthouse: 350 W. 1st Street<br><br>**HON. ANDRE BIROTTE, JR.** |

### DEFENDANT'S SENTENCING MEMORANDUM

Defendant, HELIOS RAPHAEL DAYSPRING, aka "Helios" or "Bobby" Dayspring, by and through his counsel, respectfully hereby submits the attached Sentencing Memorandum.

1

This Sentencing Position is based upon the attached Memorandum, the Presentence Investigation Report (PSR) filed March 21, 2022 (ECF 34), the Disclosed Recommendation Letter to the Court filed March 10, 2022 (ECF 33),  the Amended Plea Agreement ("Plea Agreement") filed October 14, 2021 (ECF 25), the Government's 5k1.1 Motion for Downward Departure for Substantial Assistance (ECF 40), the Letter from Mr. Dayspring provided to the Probation & Pretrial Services Office (U.S. Probation Office) on December 7, 2021 (**Exhibit A-1**), the Letters of Support contained in the Appendix (**Exhibits B-1 through B- 55**), the files and records of this case, the factors delineated in 18 U.S.C. §3553(a); and pertinent case law, and upon such further evidence and argument as may be considered by the Court at Mr. Dayspring's sentencing hearing.

Mr. Dayspring respectfully reserves the right to respond to the government's sentencing position and the opportunity to make additional comments at the sentencing hearing in this matter.  Leave is further respectfully requested to supplement Mr. Dayspring's Sentencing Position with such additional information as may become appropriate prior to the actual sentencing hearing in this matter.

Date: May 16, 2022                          Respectfully submitted:

                                      HOCHMAN SALKIN TOSCHER PEREZ

By      /s/ Sandra R. Brown-Bodner
           SANDRA R. BROWN-BODNER
           Attorney for Defendant
           HELIOS RAPHAEL DAYSPRING

                                        SHEVIN LAW GROUP

By      /s/ Eric D. Shevin
           ERIC D. SHEVIN
           Attorney for Defendant
           HELIOS RAPHAEL DAYSPRING

1

## **TABLE OF CONTENTS**

2

MEMORANDUM OF POINTS AND AUTHORITIES……………………….……..……5

3

4

I.      Introduction……………………………………………………………..……..5

5

II.     Factual Background…………………………………………………………..……7

6

7

III.    Terms of the Amended Plea Agreement and the USPO
        Advisory Sentencing Guideline Calculation and
8       Recommended Downward Variance…………………………………………..……9

9

        A.     Count One – Federal Bribery Program……………………………..…9

10

        B.     Count Two – Subscribing to a False Income Tax Return………………9

11

        C.     Grouping……………………………………………………………9

12

13      D.     Total Offense Level.…………………………………………………10

14

        E.     Government Recommendation of Low End of the
15             Applicable Sentencing Guideline Range...…………………...……..10

16

        F.     Government's 3-Level Downward Variance Agreement,……………10

17

        G.     Government's Motion for Downward Departure
18             Pursuant to U.S.G. §5k.1.1……………………………………………10

19

        H.     U.S. Probation Office's Ten (10) Month Downward
20             Variance Recommendation…………………………………………11

21

22      IV.    Mr. Dayspring's Acceptance of Responsibility…………………………...……11

23

24      V.     Mr. Dayspring's Substantial Assistance to Authorities
               Under Guideline Section 5K1.1 Should Result in at
25             Least a Six-Level Downward Departure………………………………………..15

26      VI.    Full Payment of Restitution and Agreement to Sign Civil Closing
               Agreement…………………………………………………………………...20

27

28      VII.   Sentencing Recommendation…………………………………...……21

VIII.  Argument…………………………………………………….………22

      A.    Legal Standard………………………………………………..22

      B.    Mr. Dayspring's Personal History and Characteristics
            Warrant a Sentence of Probation Subject to Home
            Detention and Substantial Conditions……………………………25

            1.    Mr. Dayspring's Background and Family…………...…………25

            2.    Mr. Dayspring's Physical and Mental Health……..……………34

            3.    Mr. Dayspring's Compliance with California State
                Marijuana Laws and Generosity to Employees in
                His Business……………………….…………………………...35

            4.    Mr. Dayspring's Service to His Community
                and Kindness to Others……………………………...……………41

      C.    The Nature and Circumstances of the Offense……..………………45

      D.    The Need for Adequate Deterrence,
            Promotion of Respect for the Law, Protect the
            Public from Further Crimes……………………...………………45

      E.    Provide the Defendant with Needed Educational or
            Vocational Training, Medical Care, Other Correctional
            Treatment in Most Effective Manner……….………………………47

      F.    The Requested Sentence Will Not Cause Unwarranted
            Sentence Disparities……………………………………………….47

      G.    The Requested Non-custodial Sentence Would Provide
            Adequate Punishment as it is Sufficient, but Not Greater
            Than Necessary, to Comply with the Purposes Set Forth
            in § 3553(a)(2)………………………………………………..49

      H.    Substantial Community Service Should be Imposed…………………50

IX.    CONCLUSION……………………………………………………50

**Exhibits** (*Redacted for Personal Identifiable Information*]

4

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### I.   INTRODUCTION

Helios Raphael Dayspring ("Mr. Dayspring" or "Helios") has accepted full responsibility for his offenses.  He recognizes and regrets the decisions that led him to take actions which bring him before the Court, and he is committed to making amends to correct the mistakes he has made.  Despite having no more than a tenth grade education and growing up with very little, including, perhaps most significantly here, the absence of a father, an examination of Mr. Dayspring's personal history reviews a compassionate and industrious young man, whose personal history and characteristics are worthy of leniency.  As reflected by the dozens of character letters submitted to the Court on behalf of Mr. Dayspring, despite having faced a lifetime of obstacles, there is one constant: Helios's innate character, as a child and as an adult, is that of an individual who, at every turn has helped and cared for others, human and animals alike – a life at odds with the criminal conduct in this case.

*          *          *

As part of a broader investigation into public corruption in the Central Coast, Helios's home was searched by law enforcement in March 2020.  Helios immediately hired counsel (the undersigned) to set things right with the Government, including accepting responsibility for his actions, cooperating in a fashion that the Government describes as extraordinary and worthy of a downward variance, and furthermore, providing substantial assistance to the Government in its investigation of others, ultimately at the risk to his own safety.  Mr. Dayspring is not some smooth, or sophisticated, operator.  Far from it.  He was the kid who never fit in, but still stood up to bullies on behalf of others.  After a lifetime of having little to nothing, he found an occupation that he was good at despite all odds, including a lack of formal education and little, if any, financial wherewithal.  In an effort to succeed in a new business venture, he let himself be talked into the "too good to be true" suggestions of *how things are done…* and, in doing so, he crossed the line between right and wrong.  The

consequences, both emotionally and financially, of that decision are something which Mr. Dayspring will live with the rest of his life.  For the past two years, he has made significant amends for his conduct.

Helios pled guilty on October 22, 2021. As part of his plea agreement, in addition to his acceptance of responsibility and substantial assistance to the Government, he agreed to pay restitution to the Internal Revenue Service ("IRS"), *which is not a mandatory condition of sentencing for a federal tax conviction*, in the sum of $3,438,793, and in addition, has agreed to sign a closing agreement with the Internal Revenue Service ("IRS"), which includes civil fraud penalties of approximately $2.8 million dollars, plus substantial further interest thereon.

Although Helios continued to operate his businesses for a limited time following the search, he began efforts to sell the businesses, as well as his properties including his personal residence, to be able to make reparations for his actions.  With the adverse publicity that accompanied his guilty plea, which as noted by numerous letters provided to the Court from various members of the Central Coast community, has extended far beyond the Government's press release, https://www.justice.gov/usao-cdca/pr/san-luis-obispo-man-agrees-plead-guilty-bribing-county-supervisor-vote-issues-affecting.  In addition to the public deterrence from such negative press, his ability to obtain a fair price for his assets has been adversely impacted.  Mr. Dayspring has also remitted, to the IRS, payment in full satisfaction of the agreed restitution. Depending upon the sentence he receives, Helios have to figure out a way to continue to support his 80-year old mother, his sister Sylvan and his brother Scott, all of whom have financially and emotionally relied on Helios for many years.

Helios respectfully requests the Court take into account his entire life history, his efforts at post-conduct rehabilitation and effort to make things right, the substantial financial penalties he already has incurred as a result of his conduct, his substantial assistance to the Government, the potential threats to his life and public humiliation, loss of businesses and opportunities already achieved, the recommendations by both

the U.S. Probation Office and the U.S. Attorney's Office for distinct and appropriate downward variances, and all factors set forth in 18 U.S.C. § 3553(a), in imposing a sentence which allows him to stay in the community with his family and begin to rebuild his life.  Consistent with many of the supervisory conditions as recommended by the U.S. Probation Office in the Disclosed Recommendation Letter (ECF 33), we have included in the below, a proposed non-custodial sentence, which, in combination, serve the goals of sentencing, which would "impose a sentence sufficient, but not greater than necessary" in Mr. Dayspring's situation:

36 months of probation, with extensive supervision requirements, including:
- home detention, with a duration electronic monitoring as determined by the Court.
- 500 hours community service.
- special assessments in the amount of $200, to the extent not already satisfied.[1]
- continuation of his counseling program, outpatient substance abuse treatment and periodic drug testing, as directed by the Probation Officer.
- refraining from any unlawful use of a controlled substance.
- truthfully and timely file and pay taxes during the period of community supervision; provide proof to the Probation Officer of compliance with this order.[2]
- not be employed in any position that requires licensing or certification by any local, state, or federal agency without the prior written approval of the Probation Officer.

## II.    FACTUAL BACKGROUND

As Mr. Dayspring has admitted, he made $29,000 in unreported cash payments, $3,000 in money orders, and provided cannabis products and meals to San Luis Obispo County Supervisor Adam Hill between 2016 and 2019.  In return, Mr. Hill voted in

---

[1] In light of the amount of restitution paid in full prior to sentencing, plus the additional civil penalties and interest owing to the IRS separately, it is respectfully requested that all fines be waived in this matter.

[2] By agreeing to sign a civil closing agreement with the IRS, Mr. Dayspring is filing the appropriate tax documents for the year of conviction and the agreed relevant conduct, so any condition that he be required to timely file returns for those years would be unnecessary as already satisfied by alternative, agreed means.

favor of county regulations that benefitted Mr. Dayspring's cannabis cultivation farms. (ECF 25, pages 13-14) While no excuse for his actions, it is also undisputed that Mr. Dayspring made his final cash payment and severed ties to Mr. Hill before the government executed a Search Warrant at his home in March 2020, thereby alerting Mr. Dayspring to the fact that he was under investigation in this matter.  Notably, the Government has not suggested that any improprieties occurred regarding the operation of Helios' licensed cannabis businesses at any time.

It is also undisputed that promptly after Mr. Dayspring learned he was under investigation, he came forward, saving the government considerable resources, and also offered to cooperate, including providing information regarding matters which he believed the government was unaware and/or had no corroboration, including the fact that in September of 2017, Mr. Dayspring, at the direct encouragement of a third-party, offered John Shoals, the Mayor of Grover Beach in San Luis Obispo County, a cash payment in return for the mayor's help in securing two cannabis dispensary licenses. While the offer was never acknowledged by Mr. Shoals nor did Mr. Dayspring ever make any cash payment to Mr. Shoals, this information was of value to the government's ongoing investigation as well as corroboration of Mr. Dayspring's credibility in that investigation and in other matters for which he provided substantial assistance to the Government and also further reflective of his fulsome acceptance of responsibility.

Mr. Dayspring admitted that he under-reported his individual taxable income for tax year 2018.  The relevant tax conduct for 2014-2017 is based upon similar facts. It is noted that Mr. Dayspring is not alleged to have under-reported any taxable income for the tax years beginning 2019.  To the contrary, no later than January 1, 2019, again, prior to learning that he was under criminal investigation, Mr. Dayspring had already taken steps, including hiring a controller for Natural Healing Center (NHC) and

putting in place internal controls, such as implementing a bookkeeping system, that ensured the accuracy of income and expenses.[3]

### III.   TERMS OF THE AMENDED PLEA AGREEMENT AND THE USPO ADVISORY SENTENCING GUIDELINE CALCULATION AND RECOMMENDED DOWNWARD VARIANCE AND DOWNWARD DEPARTURE

In the Amended Plea Agreement, which Mr. Dayspring understands is not binding on the Court, the parties stipulate to a total offense level of 23, prior to the Government's agreed 3 level downward variance for substantial assistance unrelated to U.S.S.G. §5k1.1. (ECF 25, ¶ 5(d)), and prior to the Government's agreement to file a downward departure pursuant to U.S.S.G. §5k1.1 (Section 5k1.1) (ECF 25 ¶ 6(d).

A. <u>Count One – Federal Bribery Program</u>

The base offense level for the bribery count is 12 [See U.S.S.G. §2C1.1(a)(2)]. There is an 8-level increase for the value of the bribes [See U.S.S.G. §2C1.1(b)(2)] and a 4-level increase because the bribes involved an elected official [See U.S.S.G. §2C1.1(b)(3)].

B. <u>Count Two – Subscribing to a False Income Tax Return</u>

The applicable guideline on the tax count is 22, based on tax loss of less than $3.5 million [See U.S.S.G. §2T1.1(a)(1) and U.S.S.G §2T4.1(I)].

C. <u>Grouping</u>

A 2-level increase is applied based on the "grouping" rules [See U.S.S.G. §3D1.4], which brings the Defendant's adjusted offense level to 26.

///

///

---

[3] The City of Grover Beach, as part of its annual inspection, uses a third-party, independent auditor to determine if the sales reports are accurate and complete and the reporting controls in place are operating efficiently. Further evidencing Mr. Dayspring's corrective actions prior to learning of the investigation, the independent audit – which was for the period April 2019-June 2020 - reflected a de minimis (.01% or $10,393) error by NHC.

D. <u>Total Offense Level</u>

Applying the 3-level reduction for Acceptance of Responsibility [See U.S.S.G. §3E1.1(a) & (b)] results in a total offense level of 23, and as noted in the PSR, a Criminal History Category I.  The PSR agrees with this calculation of the advisory guideline range. (ECF 34, ¶ 4)

E. <u>Government Recommendation of Low End of the Applicable Sentencing Guideline Range</u>

See, Amended Plea Agreement (ECF 25 ¶ 5(e))

F. <u>Government's 3-Level Downward Variance Agreement</u>

As noted above, the Government has also agreed to recommend a 3-level downward variance for substantial assistance unrelated to U.S.S.G. §5k1.1, which would then result in a total offense level of 20 in the advisory guideline range.[4]  (ECF 25, ¶ 5(d)).

G. <u>Government's Motion for Downward Departure Pursuant to U.S.S.G. §5k1.1</u>

Further, the Government has agreed to file a downward departure pursuant to U.S.S.G. §5k1.1.  (ECF 25 ¶ 6(d)) The Government has filed the motion and has asked the Court to grant a 2-level downward departure.  (ECF 40) As noted below, Mr. Dayspring respectfully asks that the Court exercise its discretion and grant a further downward departure of up to 6 levels.

---

[4] To provide further details to the Court regarding Mr. Dayspring's substantial assistance as recognized by the Government's 3 level downward variance recommendation, which is independent of Section 5k1.1, it is respectfully noted that Mr. Dayspring's transparency with the Government regarding his tax offense involved bringing in expert forensic accountants to perform a Net Worth Method of determining the correct tax deficiencies.  As set forth in the DOJ Criminal Tax Manual, a net worth method of proof is used when it would be difficult or impossible to establish a defendant's taxable income by direct evidence.  The defense experts, with Mr.  Dayspring's assistance, expended over 550 hours, analyzed over 26 properties and investments and 58 entities, provided financial schedules to the USAO, IRS and FBI for review and met with the Government several times to answer questions about the schedules. The defense work involved here not only saved the Government significant resources, but was a contributing factor in the time between Mr. Dayspring's first outreach to the Government in acceptance of responsibility and his offer to cooperate, and the parties' ability to finalize the plea agreement, which due to the tax charge also required DOJ Tax Division approval.

If the Court agrees to grant the Government's motion for a 2-level downward departure, the resulting Total Offense Level would be 18 and with a Criminal History Category I, the advisory guideline range would be 27 to 33 months.  If the Court agrees to grand a further downward departure, e.g., up to 6 levels, then the Total Offense Level would be 14 and with a Criminal History Category I, the advisory guideline range would be 15 to 21 months.

H.  U.S. Probation Office's *10-Month* Downward Variance Recommendation

The U.S. Probation Office has recommended a 10-month downward Variance. (ECF 33).  This is separate from the Government's agreement to a 3-level downward variance recommendation for substantial assistance unrelated to Section 5K1.1 or its motion for a downward departure pursuant to Section 5k1.1, or the Court's exercise of its discretion in determining the appropriate mitigating credits that Mr. Dayspring should be credited for his cooperation, as it is traditionally not in the Probation Office's purview to comment on Government cooperation motions.   The Government in recommending the low end (27-months) of the calculated advisory guideline range, does so *without regard* to the U.S. Probation Office's separately recommended a downward variance of *10-months* in this case.[5]  (ECF 33)

## IV.   MR. DAYSPRING'S ACCEPTANCE OF RESPONSIBILITY

Mr. Dayspring acknowledges that he made a terrible mistake by his criminal actions.  The depth of his personal shame and contrition is absolutely profound as is his acknowledgement of responsibility for the wrong he committed, and his substantial assistance to the government in a fulsome effort to continue his path to right those

---

[5] It is respectfully noted that the Government's recommendation of 27 months is without consideration of the USPO's recommendation of an additional downward variance of 10 months.

wrongs, is unwavering, as reflected in Mr. Dayspring's own words (entirely unedited by counsel) to the Court and to the U.S. Probation Office:[6]

> *To start off I want to let you know I am the youngest of 6 kids from a single mom. I knew at a very young age that all I would ever have in this world, is what I could carve out of it from my own effort and hard work. My entire life I have held the view that no one but myself could help me achieve security, sustainability, and happiness. That the only way to achieve those things would be from relentless effort and determination in whatever field I chose. I was never that great of a student, and it didnt really matter because i didnt have the stability in life to stay in school much past the 10th grade anyway. But what I left home with, was a real world view of right and wrong, good and evil, honesty and dishonesty. Having 5 older siblings who were all completely different souls, that all took drastically different paths, I had many examples laid out in front of me, of what I should try and strive for and what I should not even fathom as a path for myself. Because of these examples, and what my mother instilled, who is an incredibly strong woman in many ways, I had an idea of what I would need to do to survive.*
>
> *Thats what the majority of my existence has felt like, one form of survival or another. I have never felt security or stability in my life no matter what I have achieved or accomplished. Just a feeling of determination in search for what those around me felt. Maybe that feeling is satisfaction, love, devotion, or complacency i'm not sure even to this day. I have always felt like the things and people that matter most to me, have abandoned me when things were the hardest in my life. Over the years this has caused me to isolate and distance myself from anything that is not transactional or business related. I have always felt that people cant let me down on a personal level, if i paid them to be there. Not that i have not been let down by those who i pay, but it doesn't emotionally scar me when it happens. This has left me limiting the people around me to ones that are on my payroll, and never trusting the few around me that arent. This has deepened the feeling of isolation and loneliness in my life, but at the same time given me a feeling of great responsibility and purpose to all those that I have employed and made partnerships with.*

---

[6] Mr. Dayspring's December 7, 2021 Statement to the U.S. Probation Office is also provided to the Court at **Exhibit A-1**.

*My life over the last 15 years had become singularly focused on building a business that was too big to fail. That no matter what was taken from me, I would always have the ability to find security for my family, my partners, my employees, and at the end of the line myself. That if I unselfishly kept my head down one day, I would find not only the missing satisfaction I had strived to fulfill, but I would have created an ecosystem to protect all under my protection, direction, and guidance.*

*Over the years I have applied what I believe to be the utmost of honesty, integrity, and fairness in my dealings with all that I have come into contact with. This has caused me to have been burned for much more than my fair share of the losses, the gains, and the responsibilities to all in between. When I have felt that someone has proven themselves to not meet my standards of what a human should be, I have generally done everything in my power to get them out of my life, sometimes at great personal cost. But When building such a rapidly developing complex organization, you find yourself constantly chasing the opportunity, but sometimes not having the ability to vet or thoroughly understand some of the pitfalls that the opportunities may bring. Usually those pitfalls come in the form of bad characters infiltrating your organization and then a massive cost to cut them out. Unfortunately through legalization I did not understand much of the complexity of what I was doing, the risks I was taking, and ultimately the consequences my decisions could have.*

*Unfortunately I have made many bad decisions, and also have had people take advantage of me over the years building this business. But all the times I have been taken advantage of or made a bad decision, I have been able to mitigate it to only affect me. In this situation the extremely poor decisions that I made have cost me, my family, my business, and my employees in such an incredibly drastic fashion its hard for me to comprehend. To be humiliated on so many platforms whether it be on radio shows for months, newspaper article after article bashing my character, front pages of industry magazines as someone who obtained their position through ill means, local tv news tearing at the fabric of the entire company's efforts, It has simply been overwhelming. I have lost respect of investors that turned around and sued me, costing me partnerships that I invested millions of dollars and years of my life into. Losing the land that I covet the most, and my personal home and farming enterprises worth well over 30 million dollars. I have lost the ability to even be a member of the company I worked so incredibly hard to build since i was 19 years old. I have lost the respect of my business community where I have grown up and worked so hard to be a beneficial member of,*

*I have damaged the company's reputation in such drastic fashion there are cities that we had achieved opportunities in, and made major investments that refuse to let NHC be a part of the ecosystem at all, even with me totally out of the picture. Costing not only me personally unfathomable amounts of money, but employees their ownership opportunities which had been granted for their efforts. I lost my direction in life due to the poor choices I made and more than that, the respect from a team I killed myself to build. I have had long working relationships disappear overnight that I built over a decade, people who got up and just quit working for the company because they don't want to work for someone of bad character. I have cost loyal partners their opportunities due to my actions, which are gone and cant be fixed. Losing them and possibly generations to come wealth that could only be created at a specific time in history.*

*I could honestly go on all day about the effect that has ensued in my life, and well over 100 others. I feel ashamed, humiliated, embarrassed, and most of all responsible for the damage I have caused to everyone that has been affected by this. It's hard for me to imagine my company's story, my own story, and countless individual lives have all been destroyed in this process when We all gave so much hard work and determination. To have it all crash down in such a pathetic fashion is devastating to say the least. All those who dedicated their efforts and energy to help build one of the most respected cannabis companies in central california possibly to lose it all. Everyone has to hold their head lower because of my movements that had nothing to do with them.*

*The only thing that could happen to worsen this situation is to be sent to jail where it would really truly destroy every shred of effort that is left hanging by a thread. I still have many people like my family, my girlfriend, and now my government that will depend on me to make right by my flaws and pay restitution. Something from jail that I will not be able to do. I still have the opportunity to create value on some of the properties that are left to be entitled and sold, to help from the sidelines by offering my insight and advice to the people who have had to fill my role, and to mentor those who have listened to me for years and built themselves by the values I have tried to instill. I may have done wrong, but i can still show them that everyone screws up in life and its not your mistakes that define you. Its how you recover from those mistakes and keep your head down and keep fighting to stay alive. I can honestly say that I am a really good person and human being. There is nothing that jail will teach me that the ramifications of my actions haven't already. All*

14

*jail will do is take away my ability to keep helping the people that have no choice but to lean on me as they have for well over a decade. I need to be able to keep working and try and rebuild what I have been trying to build my entire life and that's security for my team. My skill set and knowledge will not be as valuable in the future as it is at this point in time, and I need to utilize those skills to make good with the government and repay the damage I have caused to those that depend on me.*

*I have gained more insight into who I am and why I have allowed myself to be led down the wrong path that ultimately I chose to be led down. I will not let the weaknesses in my character ever affect my decision making process again in my life. Most who have lost what I have lost would just throw in the towel in one way or another as others have due to this situation. I have too many people that depend on me to be weak minded ever again, and I will refuse to give up creating as I have been for the last 15 years. There's still a chance for me to fix my story but there may not be if I land in jail and lose what little I have left to build with.*

*The effect that has already happened will forever outweigh my lapse in judgement and now I need the ability to make amends to all that matter including myself and the story i worked so hard to build. I feel that every person at the end of the day only has the story of there life to tell. You dont get to take your land or your money or your business with you to the grave but you will always have the story of your life. It is important to me to not let the last thing i possess be taken from me and turned negative when it is truly a very positive one with what has become a major speed bump to overcome. I am truly sorry for the damage i have done and i know i can make it back if given the chance.*

## V. MR. DAYSPRING'S SUBSTANTIAL ASSISTANCE TO AUTHORITIES UNDER GUIDELINE SECTION 5K1.1 SHOULD RESULT IN UP TO A SIX-LEVEL DOWNWARD DEPARTURE

Mr. Dayspring's acceptance of responsibility included prompt and ongoing cooperation with Federal law enforcement. Helios has provided proffered testimony on multiple occasions, directly and through his counsel, against others known and unknown to the Government. Helios provided truthful testimony to the prosecutors and the investigators to assist in their investigation(s) of other individuals being investigated for their potential involvement in public corruption in the Central Coast.

*Individuals who would be considered more culpable in the public corruption investigation(s) than Mr. Dayspring.* In addition, Helios provided passwords for secured devices and detailed financial analysis, faced potential threats to his life, has been committed to testifying in the grand jury or trial, and provided additional and ongoing cooperation,[7] including electronically monitored communications, as set forth in more detail in the Government's *under seal* filing.[8]

The Government, in the Amended Plea Agreement, committed to filing a motion for a downward departure based upon Mr. Dayspring's acknowledged substantial assistance, under U.S.S.G. §5K1.1. [ECF 25, ¶ 7(c)] The Government's motion for a downward departure has been made. (ECF 40) The Government concurs with the facts of Mr. Dayspring's substantial assistance as described above, but ultimately suggests that its assessment of the value of such cooperation is more limited, arguably for reasons that are in large part not within Mr. Dayspring's control.

The Government attempts to minimize the value of Mr. Dayspring's cooperation in a variety of ways which the defense takes issue. It is undisputed that Mr. Dayspring timely met with the Government on multiple occasions, each time providing complete and truthful information. In fact, as early as April 2020, defense counsel, at Mr. Dayspring's direction, was in discussions with the Government about his cooperation, and, as soon as it could be accomplished, provided a detailed attorney proffer, again, at Mr. Dayspring's direction.

In his own proffer, calls and meetings with the Government, Mr. Dayspring fully acknowledged he received benefits, but also made clear *as the facts evidenced*, that there were times County Supervisor 1 voted in a manner that was not in the interests of Mr. Dayspring. Defense counsel is unclear what the Government is

---

[7] As recently as May 2022, Mr. Dayspring, through counsel, provided additional information about others acts which are of interest to the Government.

[8] It was fully expected that Mr. Dayspring would have testified in both respects. Tragically, Mr. Hill took his own life in 2020. Further details of Mr. Dayspring's cooperation are set forth in the Government's under seal Section 5k1.1. motion and thus, are not detailed further.

referring in its suggestion that Mr. Dayspring displayed "an initial refusal to accept" responsibility.  Again, Mr. Dayspring's clarification that the matters he communicated with County Supervisor 1 affected scores of people similarly situated, as opposed to just himself, is and was a fact.  The information provided by Mr. Dayspring against County Supervisor 1 prior to his death was overwhelmingly corroborated and there is no dispute that Mr. Dayspring would have been a key witness for the Government in a trial against the County Supervisor.[9]  Mr. Dayspring's responses may not have been simplistic statements about the payments he made, but that is to be understood from the fact that his involvement with County Supervisor 1 wasn't simplistic.  As the Government is aware, the evidence showed that County Supervisor 1 solicited Mr. Dayspring for things like rent, claiming his wife had left him and he couldn't afford to pay his rent, and for medicinal cannabis for his sick dog, playing on Mr. Dayspring's love of animals and especially sick dogs.  Mr. Dayspring fully understood the importance of his cooperation and his credibility and made every effort to be as fulsome as possible in responding to questions about what had happened over the prior several years.

The truthfulness, completeness, timeliness, and reliability of Mr. Dayspring's cooperation is further reinforced by information provided to the Government about Mayor Shoals that was uncorroborated without Mr. Dayspring's assistance.  It is undisputed that there were only three people present for that meeting.   Mr. Dayspring, at the time of his initial proffer, did not know that the Government had any information about this meeting nor did he know that the information the Government did have was a "he said- he said" contradiction.[10]  Understanding the importance of his credibility as a cooperator, despite the fact that such information could be used by the

---

[9] There is evidence that County Supervisor 1, prior to his death, believed that Mr. Dayspring was already cooperating with the Government.

[10] The Government's *under seal* filing overlooked the information that Mr. Dayspring, directly or through his counsel, also provided with regards at least another 4 individuals.

Government to bring further charges against him, he provided clear and credible corroboration about what really happened at this meeting with Mayor Shoals.

Second, the Government fails to acknowledge the significance of Mr. Dayspring wearing a wire as part of a Government investigation against a public official. Mr. Dayspring did all he could do in this regard, in addition to making follow-up phone calls in furtherance of the Government's investigation. It is of course no fault of Mr. Dayspring that his assistance did not lead to a prosecution. While Mr. Dayspring appreciates that "the Government acknowledges the value of Mr. Dayspring's effort" (Govt's Motion for downward departure pursuant to USSG 5k1.1 at page 7, lines 21-22), the effort itself is deserving of recognition by way of a further reduction under U.S.S.G. 5K1.1(3).

Lastly, the Government confirms that Mr. Dayspring was the subject of a threat against his life as a result of his cooperation with the Government. Referring to the threat as hearsay information the Government was unable to substantiate (Govt's Motion for downward departure pursuant to USSG 5k1.1 at page 8, lines 3-11) doesn't lessen the seriousness of receiving a warning call from the Government advising that the FBI had learned a death threat had been made and to be on alert. Mr. Dayspring appreciates that the Government provided him with direct contact to law enforcement but Mr. Dayspring remains in fear knowing that, while not substantiated to date, the Government has not advised that the threat was false. The fact is that shortly after learning of this information, Mr. Dayspring's live-in partner, Ms. Garcia, came face to face with some unknown person attempting to enter their remote property and who blocked Ms. Garcia's ability to leave, refusing to move her car until it became clear that Ms. Garcia was taking pictures and calling for help. The Government's motion for downward departure is the first time the Government has indicated that they *do not believe* the threat to be credible. And again, while Mr. Dayspring appreciates that the Government acknowledges the anxiety that Mr. Dayspring and his loved ones feel,

the risk of injury to himself and his loved ones as a result of his cooperation merits a further reduction under U.S.S.G 5K1.1(4).

While the Government's recommendation is entitled to substantial weight, once the Government has recommended a downward departure for substantial assistance, which it has done here as was promised in the Amended Plea Agreement, the Court has the authority to go beyond the recommendation and the discretion to depart to a greater extent. *See*, *U.S. v. Udo*, 963 F.2d 1318 (9th Cir. 1992). It is respectfully asserted that the Court's evaluation of the appropriate levels of downward departure for substantial assistance should involve not only the ultimate prosecution of others, but, as set forth in U.S.S.G. §5k1.1, further consideration of Mr. Dayspring's efforts in cooperation in the investigation(s) of others.

Mr. Dayspring should be granted a downward departure of up to 6 levels under U.S.S.G. §5K1.1. Should the Court, in its discretion, determine that less than 6 levels should be granted, it is respectfully asserted that Mr. Dayspring's overall efforts and actions to assist the Government, at significant exposure and expense to himself, be considered a mitigating factor under Section 3553(a)(1) reflecting his rehabilitation over the past two years and should be considered in further support of the requested probationary sentence.[11]

///

///

---

[11] As noted in *Pepper v. United States*, while addressing rehabilitation at resentencing [due to the Supreme Court's *Booker* decision, the prohibition on consideration of rehabilitation at resentencing was invalidated], the Supreme Court made clear that substantial assistance, rehabilitation, and demonstrated low recidivism risk are factors under which the "sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. That principle is codified at 18 U. S. C. §3661, which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct," and at §3553(a), which specifies that sentencing courts must consider, among other things, a defendant's "history and characteristics. §3553(a)(1)". Citations therein omitted.

## VI. FULL PAYMENT OF RESTITUTION AND AGREEMENT TO SIGN CIVIL CLOSING AGREEMENT

Under the terms of the amended plea agreement, Mr. Dayspring agreed to make his best efforts to pay all tax (restitution) on the unreported income for the years 2014, 2015, 2016, 2017 and 2018, [ECF 25, ¶ 2(h)(i)]. He has satisfied that obligation by remitting the sum of $3,438,793 to the IRS. Furthermore, Mr. Dayspring has agreed that he is liable for the civil fraud penalty, which is a separate civil matter. What this means is that, in total, Helios will have paid over 200% in criminal and civil renumeration to the Government for his tax crimes. The total liabilities are as follows under the terms of the Closing Agreement agreed with the IRS:

| | |
|---|---|
| Tax/Restitution: | $3,438,793.00 |
| Civil Penalties: | $2,815,532.95[12] |
| Interest: | $  787,768.92[13] |
| **Total:** | **$7,042,094.87** |

In terms of additional punishment for Mr. Dayspring, we respectfully ask the Court to take into account these large financial penalties, together with the loss of his businesses, home, and land and will be needing to re-build his life and business, in mitigation of a non-custodial sentence. *See United States v. Warner*, 792 F.3d 847 (7th Cir. 2015) (substantial financial penalties considered in determining substantial downward variance and appropriateness of probationary sentence).

The Probation Office and the Government, respectively, have recommended a fine of $20,000 ($10,000 for each Count 1 and Count 2). Mr. Dayspring would respectfully request that in light of the substantial restitution, civil tax fraud penalties and interest, the Court not impose any fines in this matter.

---

[12] This amount includes 75% Civil Fraud Penalties for each year in issue.

[13] This amount includes interest on both the tax and the civil fraud penalties for each year in issue. The interest continues to accrue until full payment.

## VII.   SENTENCING RECOMMENDATION

Mr. Dayspring made a tremendous mistake as the conduct described above and in the amended plea agreement reflects.  As consequences of his guilty plea, in addition to being a convicted felon, Mr. Dayspring has suffered significant collateral consequences as a result of his misconduct, he has had to resign as an officer of the companies he built, sell his businesses and homes and land, has lost community respect and prospective business opportunities,[14] deal with potential threats to his life, and face repeated and visceral public humiliation.  Mr. Dayspring is ashamed of his conduct and the harm it has caused to not only himself, but also his family, his businesses and employees, and his community.[15]  As a result of the tremendous stress this case has occasioned, Mr. Dayspring's health has worsened markedly.  Helios has been overweight, for at least the past decade, but over the past two years his weight has ballooned to over 300 pounds and he was diagnosed recently as suffering from Crohn's disease.

For the past two years, he has made significant amends by acknowledging his criminal conduct; providing substantial assistance to the government, and entering into a pre-indictment Plea Agreement.  In addition to accepting responsibility early and providing substantial assistance to the government in various investigations, he also agreed to, and by agreeing to sign a closing agreement with the IRS for civil tax

---

[14] Prior to the instant charges, Helios held memberships in the SLO Chamber of Commerce; the Morro Bay Chamber of Commerce; the South County Chamber of Commerce; the San Miguel Chamber of Commerce; and the Santa Maria Valley Chamber of Commerce.  That is all gone.

[15] For Helios, the material loss he has already suffered looms large, and he is deeply concerned about his family members' future welfare.  His convictions clearly jeopardize any future opportunities he might otherwise have had to work and thrive in the cannabis industry that he has done so much to build and legitimize, or any other industries, for that matter.  Helios was proud of his accomplishments in the cannabis industry and equally proud of the fact that his success as a cultivator and dispensary owner enabled him to give back to the community with consummate generosity. Unlike many, if not most, of the licensed cannabis operators who started out in the traditional, illegal market, Helios completely abandoned any illegal activity and operated all of his cannabis businesses to the letter of the law at all times. (See, https://mjbizdaily.com/california-burner-distributor-lawsuit-underlines-why-licensed-firms-cheat-to-stay-afloat/).  Based on his counts of conviction, however, he will likely never again be able to play any significant role in his community or in the industry he so dearly loves.

matters, has saved the government and the IRS significant expenditures of resources and waived not only his constitutional rights by his actions but also his rights to challenge any civil penalties for not only the year of conviction but the years of relevant conduct. It is also noted that Mr. Dayspring has also enrolled in a counseling program.[16]

Based on all of the above factors and the details provided in subsequent sections of this memorandum, Mr. Dayspring respectfully requests the Court, in consideration of an appropriate sentence, take into account his entire life history, his cooperation with the Government, the downward variance recommendations by both the Government and the U.S. Probation Office, and all other matters properly before this Court, impose a non-custodial sentence of three years of probation with extensive supervision, including a condition of home confinement with electronic monitoring, 500 hours of community service, continuation of outpatient counseling, outpatient substance abuse treatment, periodic drug testing, and employment monitoring, all of which will serve the goals of sentencing set forth in 18 U.S.C. § 3553(a), and is "sufficient but not greater than necessary" to effectuate justice in this matter.

## VIII. ARGUMENT

### A. Legal Standard

In the post-*Booker* universe,[17] the Court's mandate is to consider all of the factors set forth in 18 U.S.C. §3553(a) in determining a sentence that is "sufficient, but not greater than necessary" to meet the four purposes of sentencing, *i.e.* (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (2) "to afford adequate deterrence to criminal

---

[16] Restorative partners. https://restorativepartners.org/

[17] In *Gall v. United States*, 552 U.S. 38 [128 S. Ct. 586, 169 L.Ed.2d. 445[ (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3533(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." *Gall* at 596-597.

conduct"; (3) "to protect the public from further crimes"; and (4) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §3553(a)(2).

The Sentencing Reform Act, as revised by *Booker*, requires a sentencing court to consider Guidelines ranges, see 18 U.S.C. §3553(a)(4), but also requires the court to tailor the sentence in light of other statutory concerns as well, see Section 3553(a).

As noted by the Supreme Court in *Pepper v. U.S.*:

> *It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime.*

> *Consistent with this principle, we have observed that both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. In particular, we have emphasized that highly relevant—if not essential—to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant.*

*Pepper v. U.S.*, 562 U.S 476, 487-88 (2011) (internal citations and quotation marks omitted).

As noted in the PSR, other than a 2007 matter involving unreasonable noise, Mr. Dayspring has no criminal history. (ECF 33, page 5) Both the case law and the Sentencing Commission recognize that incarceration is not necessary for individuals like Mr. Dayspring, for whom, as a first-time offender, the crime of conviction is completely inconsistent with their true character. *See e.g., United States v. Toback*,

No. 01-CR-410 (RWS), 2005 WL 992004, at *5 (S.D.N.Y. Apr. 14, 2005); *U.S. Sentencing Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* 6-7 (2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2017/20170309_Recidivism-CH.pdf (finding that "[c]riminal history score and Criminal History Category are strong predictors of recidivism," based on data showing recidivism rates range from 30.2% of offenders with zero criminal history points to 85.7% of offenders with 15 or more criminal history points).

Further courts have recognized a basis for downward departure where the defendant's conduct was "out-of-keeping with [the defendant's] otherwise law-abiding and responsible life." *See United States v. Khalid*, No. 09-CR-734 (JBW), 2011 WL 6967993, at *2 (E.D.N.Y. Oct. 26, 2011); *see also United States v. Marsh*, 820 F. Supp. 2d 320, 353 (E.D.N.Y. 2011), as amended (Nov. 3, 2011) (explaining that the "need for sanctions is not as great" where defendants had been "law-abiding, supportive of their families, and earning a decent living through legal means").

It is respectfully requested that the Court consider the totality of Mr. Dayspring's life in determining what is an appropriate and necessary sentence to impose. Helios is, and always will be, ashamed by his actions, is extremely remorseful, took a number of corrective actions prior to learning he was under investigation, and has spent the past two and a half years making amends for his actions. For the reasons set forth below, we ask the Court to impose a sentence which will allow Helios to stay in the community, support his family, re-build his life and continue to further make amends. Such a sentence will be sufficient but not greater than necessary to achieve the goals of sentencing.

///

///

///

24

B. **Mr. Dayspring's Personal History and Characteristics Warrant a Sentence of Probation Subject to Home Detention and Substantial Conditions**

In keeping with the above and the spirit of 18 U.S.C. § 3661[18], the following detailed information concerning Helios is presented to the Court.

1. **Mr. Dayspring's Background and Family**

Helios was born in Redding, California in 1986.  He is the youngest of six children of Margaret Hartley Dayspring.

Around 1970, Margaret became involved with a Canadian hard rock miner named Bruce McKinnon. Their relationship, although never very stable, lasted more than ten years.  Between 1972 and 1982, Helios's five older siblings were born.  After Mr. McKinnon abandoned the family in 1984, Margaret, who was caring for all five kids and working part-time as a teacher's aide, struggled to keep food on the table and a roof over their heads.  Margaret met Helios's father David Irwin, a construction worker, in 1985 while living in the Redding area.  Helios was born one year later.  His parents' relationship did not last long before David moved out permanently.  Other than a few brief meetings, Helios never saw his father and never developed a meaningful relationship with him.  David passed away in 2019.  Margaret is in her 80's and has, for more than 12 years, been supported by Helios.

Helios's birth in 1986 only added to Margaret's responsibilities. Helios's mother's letter to the Court describes some of the hardships and the unending compassion he has shown to her and others throughout his life:[19]

> As a child, Bobby was caught in the midst of much conflict and turmoil. … I could not cope adequately so Bobby experienced much family stress, unpleasantness and sorrow. One sister left the family.

---

[18] No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence. 18 U.S.C. § 3661.

[19] Margaret Dayspring's letter is at **Exhibit B-44**.

When he was in kindergarten, we had moved … [t]his began a round of job changes, increased financial insecurity and frequent changing of homes.  Another sister left.

I found Bobby had become the protector of kids who were mistreated by others.  …

He would see inconsistencies between what adults said, did and would unabashedly speak the truth to them.  Your honor, this brought much retaliation down on him at a tender age. I will never forget the day (in 3rd grade) he broke down and cried – literally for hours. One of the aides (at school) had told him he had a bad heart.

Bobby has a great love and respect for dogs.  He saved a sick pup who became his greatest friend, Cooper.  Bobby provided him with a mate so he could have a family, took him to a specialist in San Francisco when he became ill and openly cried when Cooper died. … He rescued a dog who had been improperly chained and was chocking, then waited for the owner to return and chastised him for his carelessness.

At age 68, Bobby told me I deserved to retire and that he would provide me with a home and essentials for the duration of my life and so he has for the last 12 years.  A few weeks ago, he asked me what I would do if everything was taken? I do not have enough money for rent.  I would be "out on the street."

He has realized he made some big mistakes and apologized for them in a speech he gave to his employees as he stepped down from his ownership position.  I know he is greatly concerned and emotionally stressed over the present and future consequences to his family, his employees and all that he has built.

I do humbly feel that Bobby has been, is and will continue to suffer, that is punishment enough.

While Helios's oldest brother Steve, who was innately disciplined and highly responsible, did his best to serve as a father figure to the Dayspring children and did

his best to maintain order, Helios was only 4 years old when, in 1990, Steve join the military.  Steve's letter provides some further insight into what Helios's childhood was like:[20]

> Our upbringing was very humble, and Bobby never has a male role-model in his life, particularly after I left home to join the Army.
>
> The common theme…was how hard Bobby would work at any and every odd job he could find and how much he would do for the family when he did make a little money.
> Even as he faced physical assault and attempted takeovers by numerous emerging competitors, Bobby remained highly charitable and provided significant support to different members of the family.  Bobby is the sole provider for our 80-year old mother.  He has cared for her and given her a place to live for at least the last 10 years.  Bobby paid the legal fees and medical bills for one of our siblings who was fighting addiction and was involved in a custody battle.  He has organized charity events and fund raisers for children and police benevolent organizations to give back to his community and to demonstrate his effort to supporting law enforcement as his industry attempted to get legitimacy.  Bobby also organized food drives and provided turkeys to families in need at Thanksgiving because he never forgot what it was like to be in their shoes.
>
> [H]e has demonstrated his kindness and goodwill to family and strangers alike. … Please consider that Bobby's value as an employer and citizen has had far greater benefit to the State of California and his community than what restitution the government might gain by incarcerating him.

In 1990, when Helios was 4, Margaret moved the family to Bradley, California off Highway 101 north of Paso Robles.  In Bradley, Margaret taught kindergarten through the fourth grade in a tiny two room school.  Helios completed kindergarten at

---

[20] Steve is a Chief Warrant Officer, Level 5, in the U.S. Army.  His letter is at **Exhibit B-3**.

Bradley Elementary School.  Margaret then moved the family to Morro Bay in San Luis Obispo County on the California Central Coast.

In her letter to the Court, Helios's sister Sylvan[21] writes:

> First, I'd like to tell you a little bit about my brother.  He is 10 years younger than me and was born into a family with five siblings.  Our circumstances were rather difficult as we only had the financial and emotional support of a single parent, our mother. While my Mother worked full time to support us, she also had to rely on the food stamps to feed us, we had to work odd jobs (babysitting, paper routes, selling berries/figs/apples we picked, etc.) to pay for our clothes and any sports programs.
>
> Unfortunately, when I was around 14 years old, our family unit began to unravel…  The oldest in our family was preparing to join the military, both of the girls had left, and then Helios's two older brothers eventually also left and were absorbed into the foster care system.  Helios was only 4 years old when I first left home and as his primary care giver, this was devastating for him; he was 5 when my sister Crystal left, and 7 or 8 when Kevin and Scotty left.  He was basically left to fend for himself while my Mother tried to be a good parent to her last child.
>
> Helios, like the rest of us, found ways to cope with poverty and to earn his own money. When he was in the 4th grade, my Mom lived near a small golf course in Los Osos, California; after it was closed for the evening, my brother would go and collect all of the golf balls he could and he'd sell them back to golfers the next day.
>
> On Halloween, my brother would spend hours trick or treating to gain enough candy to sell back to kids at school…
>
> He and his friend Josh would wash cars on the weekends and they even hunted for birds to cook for dinner when my Mom was working (this did not go over well with me...I was

---

[21] Sylvan Dayspring is Helios's oldest sister.  Her letter is at **Exhibit B-14**.

shocked when I caught them cooking up a bird and asked "WHY?!!" Helios was very matter-of-fact and said; "this food is free and the food in the store costs a lot of money".)

Your Honor, the point that I'm trying to convey is that my youngest brother has always had a knack for raising money, a creative mind, and an incredible work ethic. He went through some very tough times as a little boy, and promised himself that someday he would be successful, that he would take care of our Mom, and that he'd be there for the family he'd lost.

He has provided a home for our 80 year-old mother. … When my brother Scotty was near death due to his alcoholism, Helios stepped in and worked tirelessly to help him rebuild his life and stop drinking. When my 15 year relationship collapsed, my brother was the first one there with a moving truck, financial and emotion support, and he found me a safe place to live. When my sister was going through a divorce… Helios paid her legal fees.

[H]e expanded his mission to give children in need at Christmas, his annual toy drive… [t]hese toys were not donated; he purchased them with his own money and hundreds of families brought their kids to pick out anything they wanted.

I know that he truly regrets some of the choices he made and the relationships he formed. He trusted some very unscrupulous older men who used his trust and naivety against him to get what they wanted. I think that not having an older male figure in his life left him vulnerable to the influence of men who sought financial gains, no matter the costs. I know that he is very sorry for his poor judgment and for any shame this has brought to our family.

I am asking that you please consider leniency when sentencing him.

In Morro Bay, Helios attended Del Mar Elementary School from grades one

through four.  Mr. Siegfried,[22] describes Bobby's compassion and kindness for others:

> I got to know Bobby when we played on a youth soccer team that my Father coached.  Bobby and I both came from financially struggling households so we had that in common.
>
> What I noticed about Bobby…at a young age was his drive to be a leader, and his kindness towards everyone around him.  …we had a special needs kid on our soccer team named Farland…  On the first day of practice the other kids on the team were giving Farland a hard time the way kids do, but Bobby immediately went up to Farland and encouraged him and stood by his side not caring what the other kids may think of him being friends with Farland.  He made sure nobody messed with him and nobody did.
>
> Bobby never seemed to care growing up if he was on the popular side of the issue.  He just stood for what he felt was right and took a leadership role from a young age.

Helios's childhood was quite unconventional.  He learned to fish, "the hard way", because his mother couldn't afford to pay for a normal fishing rod.  He would attach a hook and a short line to a clothes hangar and catch rock fish and eel in the tide pool areas at the Morro Bay waterfront.[23]

Mr. Howard-Greene[24], describes Helios's great admiration for hard-working, self-made individuals:

> I met Bobby in 4th grade at Teach Elementary in San Luis Obispo.  We ended up on a soccer team together and became fast friends…
>
> Teach Elementary was a school known to have a more rigorous curriculum than the other schools in the county.  High achieving students attended the school from towns across the county.  The high level of parent involvement

---

[22] Michael Siegfried has known Helios (Bobby) for 30 years, since they were young children in Morro Bay.  His letter is **Exhibit B-35**.

[23] *See* Letter from Helios's cousin Melissa Ginotti at **Exhibit B-10**.

[24] John Howard-Greene has known Helios since elementary school.  His letter is at **Exhibit B-24**.

> combined with other factors resulted in the school being filled with the children of affluent families…
>
> While Bobby was every bit as intelligent as the rest of the students he did not come from a privileged background… While the rest of us had no concept of poverty and insecurity Bobby was living in a situation that greatly differed from the rest of us.  I believe this massively impacted Bobby.  I believe Bobby was embarrassed that his family lived paycheck to paycheck and struggled to pay for basics…and things as simple as a pair of soccer cleats.
>
> As we grew older…I noticed that Bobby held great admiration for adults that displayed an exceptional work ethic and achieved success that provided the financial security he did not have in his own life.

The Dayspring family moved to nearby Los Osos when Helios was ten.  He completed the fourth grade at Sunnyside Elementary in Los Osos and the fifth and sixth grades at Teach Elementary in San Luis Obispo.  After completing elementary school, Helios attended Los Osos Junior High in Los Osos and Morro Bay High School in Morro Bay through the ninth grade.  For spending money, he did whatever odd jobs came his way, which included buying bulk candy that he would re-sell at school and selling fish that he caught to the local restaurants.

During his freshman year at Morro Bay High School, Helios's grades plummeted.  His mother decided to move back to northern California to teach at a charter school and arranged for Helios to live with his sister Crystal in Waterford, Connecticut.  In Waterford, Helios attended Waterford High School where he worked hard and made the honor roll during his sophomore year.  He also found a source for marijuana and continued to smoke on a regular basis.

///

///

///

At the end of his sophomore year, Helios moved in with his Aunt Sheila and Uncle Richard who also lived in Waterford.[25]  He went to work part-time in one of their pizza restaurants.  After living with his aunt and uncle for a year, Helios moved back to his sister Crystal's house.

In her letter to the Court, Helios' sister Crystal writes about how generous Helios was despite the almost unsurmountable odds he faced as a child:[26]

> As children we grew up in a very tumultuous environment. … Our mother was a single mom with six children.  Although she worked very hard, she needed assistance from the state to keep us fed and to keep a roof over our heads.
>
> Going into our teenage years, things became very dysfunctional.  Our oldest brother went to the military at the age of 18.  The rest of us spent time in foster care.  Bobby's father had abandoned him, then one by one we all left him too.  It was a hostile and abusive environment.  As the youngest, he was left alone to fend for himself.
>
> Through his early teenage years, the situation was out of control.  He decided to live with me in Connecticut to avoid foster care. … During the time he lived with me, he became close with my daughter.  He loved spending time with her and would take great care of her.  At the time she was only an infant, but their bond remains close.  Despite not seeing each other for years because we live so far away, he has remained like a father to my daughter.
>
> Throughout all the hardships I have faced in my life my brother Bobby has been there for me in every way he could.  He was there when my daughter was born, he supported me emotionally and financially through my divorce, and has continued to be emotionally and financially supportive since.  He employs one of my other brothers and my sister and takes

---

[25] Helios also spent much of each summer from the fourth through the seventh grades living at his aunt Sheila's home in Connecticut.

[26] Crystal Dayspring's letter is at **Exhibit B-36**.  The letter from Crystal's daughter, Gianna, is attached at **Exhibit B-37**.

> care of my elderly mother.  He has gotten me through some of my darkest times and helped me when I needed it.  My children have experienced so many amazing things in their lives that never would have been possible without him. They have gotten to see California and have done incredible activities because of his hard work and his generosity.
>
> I implore you to consider what a wonderful person my brother is.  He is a brother, and uncle, a son and a great person with a big heart.  Some mistakes he has made shouldn't undermine all the good he has done for those around him.
>
> I am asking that you please show leniency because he has so much more to offer the world.

Helios eventually moved out of Crystal's house and lived in a tent in a state campground.[27]  He dropped out of school before completing his high school degree and began working in restaurants bussing tables, washing dishes, doing food prep, and working in a grocery store.  When he saved enough money, Helios bought his first car and then found a job at a large boatyard in Niantic, Connecticut, where he bottom-painted boats, did pressure-washing, and janitorial work.  Once he turned eighteen, Helios returned to California where he moved into a spare room at his middle brother Kevin's house.

Scott, who is the youngest of Helios's three older brothers, writes to the Court about his survival based on the unhesitant love and strength of his brother, Helios:[28]

> I would not even be alive today without my amazing little brother. … I also can say with 100% honesty that my little brother saved, helped and inspired hundreds of lives.  He personally delivered medical marijuana to thousands of terminally ill and sick cancer patients while he was also dealing with my own struggles as a recovering alcoholic.

---

[27] See Letter from Helios's cousin Michael Ginotti, at **Exhibit B-4**.

[28] Scott Dayspring's letter is at **Exhibit B-39**.

I was abused, in foster homes, group homes, JSC, and in prison at 17 after a fight in high school.  I never met my father.  Helios' father wasn't in the picture for very long thankfully.  He wasn't a good man by any means and to this day I still carry his scars mentally and physically. … the demons of my past wouldn't allow me to move forward in life.

During and through all of this there was a man who saved me multiple times, that man is my little brother.  I literally came home on an Amtrak with nothing but the shakes, puking blood, on death's doorstep.  My little brother offered me a warm bed, and gave me just enough alcohol so I wouldn't seize up & die.  He stayed up with me saying "I love you, you are worth life brother. I will help you".  Even after all the negative destructive things, he never gave up on me. … He offered me a job with restrictions of course so I wouldn't drink. … I did this for a couple of years before my alcoholism … took me yet again.  My little brother saw this and quickly stepped in, passing no judgement, he simply offered help.  My life has changed dramatically for the better…. None of this would have been possible if it weren't for my little brother's kind heart, understanding, love, & his honest hard work.

I do know first hand that some of us belong inside [prison] and some of us don't.  I can say with 100% honesty that Helios does NOT belong there.

Please consider my words and understand that my brother is an honest, hard working, generous, compassionate, loving individual that does not deserve to serve time in prison.  Please take care in your decision because this man truly means so much to so many.

## 2.  Mr. Dayspring's Physical and Mental Health

Although he continued to work steadily once he returned to California, during his early 20s, Mr. Dayspring he was quite depressed and went through a period where

he drank heavily.  In 2007, however, Helios stopped drinking almost completely other than the occasional social drink.[29]

Mr. Dayspring is five foot ten and weighs approximately 300 pounds.  His obesity may stem, in part, from a subtle eating disorder he developed in childhood. Due to his family's relative poverty, there was never much extra in the refrigerator or the cupboards.  As an adult, Mr. Dayspring often uses food as a way to alleviate the accumulated stress of endless 12 to 15-hour workdays and his constant feelings of financial responsibility to those around him.  Mr. Dayspring reports experiencing mild respiratory problems on a fairly regular basis.  Mr. Dayspring suffers from periodic agonizing attacks of kidney stones.  His first attack occurred eight years ago and since then he has been rushed to the emergency room on several occasions. Mr. Dayspring has been diagnosed with Crohn's disease, which can be life-threatening and has resulted in chronic abdominal and intestinal pain and discomfort.

Mr. Dayspring suffered from depression and anxiety since early childhood, having been deeply affected by growing up fatherless and in near poverty.  Now, as a result of this conviction, he is having difficulty getting to sleep and difficulty staying asleep due to his anxiety and additional discomfort from the Crohn's disease.

As part of his bail conditions for drug testing, as noted above Helios learned of a counseling program that he could enroll in and has done so.  He has found this to be a significant benefit to his mental health and would like to continue, with or without a Court ordered condition, to participate in this program and continue to receive this professional assistance.

### 3. Mr. Dayspring's Compliance with California State Marijuana Laws and Generosity to Employees in His Businesses

Once he had his Medical Marijuana card, Mr. Dayspring began growing small quantities of marijuana, first indoors and then later outdoors on a farm in the nearby

---

[29] Around 2007, Helios received a Medical Marijuana prescription to help alleviate his chronic anxiety and depression.

Tepusquet.[30]  The word soon spread that Helios was extremely reliable and only produced first-rate product.  Over the next few years, Helios's medical marijuana business expanded.

He purchased 40 acres of raw land in 2008 in the Tepusquet Mountains with the intention of growing medical cannabis on the land, which was without power and water.  Helios moved onto the land and lived in a 5-wheel trailer with his two dogs.  He met with opposition from his neighbors over his intention to grow cannabis.  He then rented properties near Atascadero and moved his mother into a rental property.

Beginning in 2011, Helios began supplying medical cannabis to numerous medical cannabis dispensaries in the Riverside, Ontario, and San Bernardino areas.  By 2013, he was supplying up to 30 dispensaries with cannabis.  As required by California state law, Helios registered his grow sites with the County and applied for grow permits.  Helios took great satisfaction in providing employment and career advancement opportunities to Central Coast residents.  He paid his employees handsomely.  Entry-level employees earned $15 to $19 per hour.  After one year, they were put on salary starting at $45,000 per annum.[31]

Ms. Deleo[32] writes to the Court:

> I have worked for Helios Dayspring for the last three years.
> Starting as a receptionist with no degree or education, I was
> given the opportunity of a lifetime.  Over the course of my
> time here, Mr. Dayspring guided me on the path to success,
> I am now a Marketing Associate for Natural Healing Center
> for all locations, with skills I can take with me anywhere in
> life.
>
> I have the utmost respect for this man…  …my children and
> I are the happiest and most successful we have ever been in

[30] At this time, under Proposition 215 and the Medical Marijuana Program Act, if an individual had a medical marijuana card and was part of a collective, he or she could grow and possess on behalf of other patients who were also members of the collective.

[31] See Letter from Patrick Girgis at **Exhibit B-17**.

[32] Lacie Deleo's letter is attached at **Exhibit B-5**.

my life due to the opportunities provided by Mr. Dayspring and his girlfriend Valnette Garcia. I have struggled, working part time jobs, and never having the opportunity to spend quality time with my children. That all changed rather quickly after getting hired at Natural Healing Center. Two months in and I had my first performance review with a generous raise… I was asked to leave my waitressing job so I could work full time with weekends and evenings off to be with my children. This is the kind of people Mr. Dayspring and Ms. Garcia are, unselfish and always thinking of others… Last year I was able to give my children the best Christmas, it meant the world to us…

…In the fall of 2019. I was expecting and no one in my family would throw me a shower. Mr. Dayspring and Ms. Garcia decided they would throw me a shower and surprise me with many gifts and memories. I was in awe at the kindness and generosity they showed me. When Mr. Dayspring met my partner, he told him how much they appreciated me and my hard work. It was the nicest thing anyone has ever done for me in my whole life. They have given me more than a steady full-time job; they have given me confidence…

I am aware of the charges… Ms. Garcia is his backbone, and she is trying to stay strong for all of us, but it's apparent the pain it is causing her, the staff and his family. I can see the pain and remorse in Mr. Dayspring's eyes. I know he is remorseful because of the type of man he is. He would do anything to make it right…

Mr. McGlothlin[33] describes in his letter:

I first met Helios when I was working for a construction company that wasn't treating me fairly. I was offered a position to work for Mr. Dayspring with an extremely fair pay and working conditions. Quickly I went from being the new guy surrounded by new faces to feeling as if I was working on my family's ranch. The family-oriented feeling is something that was strongly implemented by Helios

---

[33] Corey McGlothlin's letter is at **Exhibit B-45**.

himself. I've never met a boss that would work side by side with his employees, sweat, laugh, and grind the way he has. …over that time I went from being homeless, living in my beat down car, to now having my own home and 2 beautiful vehicles. Not because working in the weed industry is where the money is, but because Helios was able to notice my hard work and dedication… I've always been a leader myself and never seen myself taking orders. With that being said, I would follow Helios into battle if asked. He has helped motivate me as a man and a worker to a point where I now manage myself, and NHC Grover Beach. The first and largest business in the NHC chain. I do this with great pride in an appropriate and professional manner…

Since being a part of Helios's adventures in the cannabis industry, I have seen him contribute far more to the community I grew up in than any other cannabis or regular business owner from our local area. He wants to see his own business grow into something beautiful, but also wants to help support the growth of our local community. I have personally helped with many events organized by Mr. Dayspring such as turkey drives on [T]hanksgiving, toy giveaways on Christmas, [E]aster egg hunts for the community, walk of life events for children fighting cancer and so much more…

I've read articles on him in the past that have tried to put his name in a dark light, where it doesn't deserve to be. Nobody understands the lengths this man would travel to see everyone under him succeed in life. … It is demoralizing to see someone who has done nothing but worked his life away, to provide for himself, family, and create opportunities for others. Only to have his name ran through the mud and loose connection to everything he has built.

I know it was hard for him to ask us for these letters, as he has never asked anything from us outside of our time and devotion. I understand that we must all except repercussions of our mistakes in life, but I do hope you see that Helios being apart from the central coast will be a misjustice to the community, and his employees.

Mr. Bulmer[34] writes:

> Seeing what this company has done for everyone involved is absolutely mind boggling, and I wish that other companies in the area and their management cared as much about people in our communities as Helios and the company he built, show on a daily basis.
>
> I have been employed with Natural Healing Center for the last few years, and I can comfortably say that it has been one of the most fulfilling times of my life… I was astounded by how aware Helios and his company was of the struggles people face in their day to day lives and their drive to alleviate that in as many ways as possible… Helios and Natural Healing Center staff have been some of the most generous and caring people I have ever worked for and I know that all of this was only possible because of the principles Helios founded this company on. They have made sure the staff is making livable wages with generous raises for everyone (a challenge here on the coast), and that they have a clear career pathway with tons of opportunities. He has also provided real leadership in the way he teaches people problem solving skills, critical thinking and how to further oneself while providing care and compassion to the community… His drive and passion are unparalleled…
>
> Last year during the holiday season I had a severe issue with my back that left me partially paralyzed for a period of time. It was one of the scariest moments of my life, and at that time, I didn't have much family nearby to care for me. Helios went out of his way constantly to make sure I didn't go without. Always making sure I had food and even allowing me to help with my duties in other ways so that I had enough to cover my bills. Even the smallest thing like making sure I was picked up from the hospital right after my spinal surgery was just so much more than what I would normally expect from an employer… Helios is an asset to this community and it actually pains me to see some of the disparaging things that have been written because I know for a fact that the opposite is true.

---

[34] Joshua Bulmer's letter is at **Exhibit B-7**.

Mr. Young[35] writes in a letter of reference:

> Through hard work and dedication and never giving up Helios has built one of the most respected, well run and successful businesses in San Luis Obispo County.  Hard work isn't a new thing for Helios, I have watched him since he was a kid and his path to success started long ago with a can-do attitude…

> One of the most admirable things about Helios is as he has grown, he has continued to keep the people around him involved and engaged, providing many local friends and family jobs and a path to success...  I have personally had the pleasure of helping Helios in many of his Real Estate transactions…  He always puts his local community first…

> In every business and personal interaction with Helios I have found he sticks to his word.  If Helios promises to do something, he always follows through no matter how difficult it is he sees it to the end.  A true man of his word, it has been impressive to watch him grow and continue to evolve in an ever-changing industry…

> [I]t's obvious the burden he carries is heavy and he is extremely remorseful. …[T]he public attention his mistakes have brought him I believe have embarrassed him within his local community and amongst his peers.  I can't imagine how painful all of this must be to be dealing with, and I can only attest that to my interactions with him it seems horrible. The physical and mental stress it has caused him is visible. I believe Helios has most certainly learned his mistake and is facing up to it and owing up to it and wants to make it right.  I feel the public embarrassment and his intentions of making it right should carry some weight in his sentencing.

Helios was formerly the owner of 6 active grow sites with the potential for 12 more that were all being entitled but has lost all of that because of his criminal conviction.  Furthermore, he no longer has an interest in the Grover Beach, Turlock,

---

[35] Aaron Young's letter is at **Exhibit B-51**.

or Morro Bay dispensaries and only holds a 19.9% interest in the retail operations at Lemoore.  Additionally, San Luis Obispo revoked NHC's license due to his criminal plea, after he had invested millions to purchase real estate and build out the business. Money that he will be unable to recover as the City has rescinded NHC's permit and is blocking his ability to sell the real estate for the same use.

Among the collateral consequences that Mr. Dayspring has already faced include the fact that due to the instant matter, he can no longer be an officer in any of the entities in which he has an interest.  Prior to pleading guilty, Helios had written his letter of resignation, which he formally submitted.  In addition, due to his admitted conduct in this case, Helios has faced further litigation which has resulted in the loss of his home and over 750 acres of land on 6 different properties as noted above.

### 4. Mr. Dayspring's Service to His Community and Kindness to Others

As noted in many of the letters provided to the Court, for years, Helios, directly and through his entities, built a track record of deep community involvement.  Since 2016, Helios has organized and administered an annual turkey giveaway for families in need.  Families receive a frozen turkey along with sides and desserts.  In total, this event has donated over 900 turkeys.  Helios has also donated turkeys to the Morro Bay Monday Night Community Dinner as well as to Rock Harbor Christian Fellowship Church; 40 Prado Homeless Services Center; 5 Cities Homeless Coalition; and SLO Food Bank.  Helios and his organizations have held an annual Christmas toy giveaway for families in need.  Helios and NHC have held community Easter Egg Hunts and Halloween events at the Grover Beach Exploration Station.[36]  In 2018, Helios and NHC arrived at KSBY's studio with a truck containing thousands of toys for the final day of the Season of Hope toy drive.

Helios, individually or along with NHC, sponsored the following Central Coast organizations and donated to their events[37]:

---

[36] See Letter from Kenneth Ray Johnson, Jr., at **Exhibit B-2**.

[37] See Letter from Donna Polizzi at **Exhibit B-18**.

- 2019 and 2020 SLO Chamber of Commerce Good Morning SLO
- 2019 SLO Cal Open Surf Event (Pismo Beach and Morro Bay)
- 2019 Women's March
- 2019 Pismo Beach Pawfest benefiting Wood's Humane Society
- 2018 and 2019 Morro Bay Avocado and Margarita Festival
- 2018 Muscular Dystrophy Muscle Walk (Pismo Beach)
- 2018 & 2019 Morro Bay Chamber of Commerce Annual Awards Gala
- 2019 Morro Bay Rotary Crab Feed
- 2018 and 2019 SLO Chamber of Commerce Gala
- 2017 and 2018 Mayor's Cup Golf Tournaments
- 2018 and 2019 Stone Soup Music Festival
- 2020 SLO Film Festival
- 2020 Santa Maria Rodeo & Street Fair

Between 2016-2021, Helios, personally or in conjunction with NHC, made the following additional monetary donations, totaling almost $500,000, to worthy local area entities:

- Donated to relocate a youth skatepark.
- Donated to change the parking in Morro Bay to benefit the downtown area.
- Donated to several Homeless Services Fundraisers (Five Cities Homeless Coalition, etc.).
- Donated to RISE to fund counselors to clear a backlog of sexual assault victims awaiting help.
- Donated to the Morro Bay Open Space Alliance to help preserve Eagle Rock.
- Donated to the Historical Society of Morro Bay for the Franklin Riley Park fund.
- Donated to the Boys and Girls Clubs of Mid Central Coast to fund substance abuse program.
- Donated to the Blochman Unified District to hire a counselor for students.
- Donated to the San Miguel Unified School District.
- Donated to the Morro Bay Aquarium to help fund plans.
- Donated gift cards to the San Luis Obispo Legal Foundation for seniors.
- Created Cancer-Well-Fit NHC which donated gift cards to cancer patients.
- Donated for an Edible Hydro Garden for Delta High School in Orcutt.

In addition to his comments about how Helios has helped him give his own family a better life, Mr. Gonzalez has asked that the following story be presented to the Court:[38]

> One year Tepusquet mountains were on fire in the middle of our grow season.  We were in the midst of losing everything we had built on one of our farms.  When I say everything, I mean everything.  Our entire crop, all our infrastructure, all our hard work developing this farm over the prior 3 years…

> Well, halfway up the mountain our employees had pointed out that there was a baby bear…in a tree.  Its mother and it had been obviously separated.  As the fire came closer and closer it was evident it would perish in the fire and was waiting for a mother that was not going to return.

> You could barely see 20 feet in front of your vehicle as the smoke had gotten so thick.  Helios directed everyone it was no longer worth the risk to our employees and that everything that was left would have to burn.  But what he also decided was that he would not let this bear die.

> Helios directed everyone including myself to fall back and get out.  He set up the cage with food as the bait and water inside and parked where he had a view…  He sat there and waited.

> I told him just to leave with us and if the fire department let us back in, we would try later.  He explained that if the bear hadn't left in all these days it wasn't going to, and if he trapped it in a cage and the fire burned through and killed it, he wouldn't forgive himself. So, he sat there and waited.

> It took 7 hours before the bear went in the cage.  The whole community evacuated but Helios didn't.  He wasn't thinking about our million-dollar crop burning to the ground, but an animal that was defenseless that he was determined to help. Help it he did, you should have seen the pride across his face when he showed up in town with a damn baby bear in this

---

[38] Luis Armando Gonzalez's letter is **Exhibit B-16**.

cage in the back of his truck.  He called fish and game and
they came [and] got the bear.  Helios has a heart of gold…

As the Court reads the entirety of letters submitted by family, friends, employees and respected members of his community all in Mr. Dayspring's support, it will be evidence that he is a compassionate and generous son, brother, friend, employer, and member of the community who is consistently described as a man who unwaveringly and unquestioningly jumps to help others.  While only a few of the letters have been excerpted, as the Court will readily see in reading all of the letters submitted in their entirety, the letters show a unity on several fronts: an unwavering support and compassion for a man who puts others above himself and, despite facing more hardships than most can ever imagine enduring, has done so much for others.[39] Letters which show that his mistakes with Mr. Hill and Mr. Shoals were not reflective of his overall efforts to comply with the regulations and laws in his business dealings.[40]

---

[39] Lemoore, California City Manager Nathan Olson describes how Helios has contributed to the city's wellbeing: "Mr. Dayspring has always been available and responsive to any requests the City has made.  His work ethic is evident in the quality of the retail store his team has built in Lemoore. It has assisted in beautifying Downtown Lemoore.  He has also been a main driver in job creation in the City… This is a request to give Mr. Dayspring credit for all the worthy things that he has done for the community, employees, friends and family."  **Exhibit B-34**.

Retired Santa Barbara County Sheriff Jon Simon describes: "I'm not in favor of cannabis. I don't use it.  But, when I think about a young guy like Helios being willing to spend a big percentage of his profits every year to make a local community where he wants to open a dispensary; safer, and to partner with local law enforcement to do so, that speaks to me.  It doesn't absolve him of what he did. But it does speak to his values, and his character. … And so, I hope you will take that into consideration when you decide your sentence."  **Exhibit B-12**.

[40] Thomas D. Green, a partner at the San Luis Obispo law firm of Adamski Moroski Madden Cumberland & Green, LLP describes in his letter to the Court: "Despite the difficult and burgeoning regulatory landscape, my observation of Helios is that he had a good faith commitment to meeting and operating under all legal requirements…. I would urge the court to consider Helios on a broader scale rather than from his lapses in judgment. He has done a lot of good for his community and his employees.  He recognizes what he has done and has already experience the devasting impacts from his actions."  **Exhibit B-32**.

Joe Armendariz, a former elected official, whose company managed the public affairs of the Santa Barbara County Taxpayers Association (SBCTA) and numerous other nonprofit government advocacy entities beginning in 1998 states: "I can testify to the fact that since I started working with Helios in June of 2020, he has asked me to help him succeed but by working 100% within the legal channels of the existing government review and approval process… I urge you to avoid making an example of him.  … His mistakes don't define him.  **Exhibit B-55**.

*(cont'd)*

In significant part, Helios didn't go looking for trouble.  To the contrary, he hired a number of professionals in his attempts to navigate an extensive, confusing, and in flux burgeoning regulatory framework.  Many of whom, even the government would acknowledge, led Mr. Dayspring to what ultimately was the most devasting decisions of his life.  Decisions which do not reflect Mr. Dayspring's true character, which despite of a life of extreme hardship, is one of endless, selfless good deeds for others.

Mr. Dayspring's compelling personal history and characteristics merit leniency and support the requested sentence of probation with extensive conditions, including home detention, in this case.

## C.  <u>The Nature and Circumstances of the Offense</u>

Mr. Dayspring acknowledges the seriousness of his crimes.  He has accepted full and complete responsibility for his conduct and will endure the consequences for the rest of his life.

Mr. Dayspring's actions are not in dispute.  The full details of Mr. Dayspring's conduct are set forth in the Plea Agreement and discussed upfront in this filing.

## D.  <u>The Need for Adequate Deterrence, Promotion of Respect for the Law, Protect the Public from Further Crimes</u>

Deterrence has two aspects, specific (or individual) and general (or societal).  Given the highly public nature of his case, anyone who has followed this case and is cognizant of the crushing repercussions of the mistakes Mr. Dayspring has made will likely be dissuaded from engaging in a similar course of criminal conduct.  By the same token, the Court can have a high degree of confidence that Mr. Dayspring will not commit future crimes which goes to both individual deterrence and the need to

---

Randall Fox, a Santa Barbara based lawyer, writes to the Court: "I have always found Mr. Dayspring to be honest, straight forward, and a person to honor his commitments. In our relationship, he has asked what the rules are and how they apply to him and his business operations.  Mr. Dayspring actively works to comply with the rules. … I believe his intentions are good, that he has learned his lesson, and that he will be a benefit to society if he is allowed his freedom and continues to conduct business operations rather than become incarcerated…" **Exhibit B-6**.

protect the public.  There simply is no need to incapacitate Mr. Dayspring to protect society from future crimes on his part.

First, Helios's entire background, as well as the many letters of support the Court has received from his friends, family, and professional colleagues, suggests that his offense was an aberration from an otherwise law-abiding life.  Second, there is every indication that the humiliation of his plea, the financial toll the case has taken on him, the mental anguish looming over him throughout these proceedings, the huge monetary penalty, threats to his life, and constant public humiliation, are sufficient to deter not only Mr. Dayspring – but others - from future criminal conduct, even in the absence of a sentence of imprisonment.  For those watching this case, based upon the constant coverage by several coastal publications and internet commentary, there are many, the crushing repercussions of the mistakes Helios has made will strongly dissuade those who would consider engaging in similar conduct.

As the Supreme Court has pointed out, the need for a sentence to promote respect for the law does not invariably weigh in favor of imposing a prison sentence whenever it is among the available sentencing options. In *Gall v. United States*, for example, the Supreme Court specifically agreed that the unique facts of the defendant's case supported the district court's conclusion that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." 128 S. Ct. at 599.

On the unique facts of Mr. Dayspring's case, and because of all the consequences suffered by him as a result of his conduct, a non-custodial sentence that takes those consequences into account and recognizes Mr. Dayspring's withdrawal from criminal activity prior to learning that he was the target of a federal investigation, his early acceptance of responsibility and his assistance in the investigation of others as well as of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial

and permitting the United States and the court to allocate their resources efficiently, his loss of his businesses and homes at a tremendous financial burden and financial penalties, sends a message to others that reflects the seriousness of the offense, promotes respect for the law, provides just punishment, and affords adequate deterrence.

The more than 50 character letters provided to the Court in support of Helios overwhelmingly demonstrate a man of tremendous character who built others up along with himself based on hard work, dedication to his community, and a drive to succeed. The trust and respect Helios has lost among his peers is as significant and painful, if not more so, than the loss of his businesses. The letters of support make it clear that Helios' past mistakes do not define who he is and should not override all the good work he has done, and continues to do, on the Central Coast. Helios has been greatly punished already and through his acceptance of responsibility and continuing efforts, he has demonstrated his commitment to paying his debt to society and to the Government.

### E. Provide the Defendant with Needed Educational or Vocational Training, Medical Care, Other Correctional Treatment in Most Effective Manner

Mr. Dayspring has no need for educational or vocational training, or other correction treatment. Although Helios left high school after the tenth grade, he is an intelligent man with adequate reading, writing, and math skills. Given this firm basis, he is more than capable of acquiring any supplemental education and/or training that he may require on his own at his own expense as a free and contributing member of society. He would, however, need medical care if he were in custody.

### F. The Requested Sentence Will Not Cause Unwarranted Sentence Disparities

18 U.S.C. § 3553(a)(6) also requires the Court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Pursuant to the Amended Plea Agreement, the

USPO recommendation of a 10 month downward variance, the Government's recommendation for a downward variance for extraordinary acceptance of responsibility as well as its downward departure for substantial assistance, and all the matters to be considered under Section 3553(a), a probationary sentence in this case would not cause unwarranted sentence disparities.

A review of sentences in similar cases can provide insight in fashioning a probationary sentence that provides just punishment.

In the matter of *United States v. Bucknor*, Case No. 2:20-cr-00294-AB, Ms. Bucknor, pled guilty to a violation of 18 U.S.C. §661(a)(1)(A) and a violation of 26 U.S.C. §7201, with a PSR calculated offense level 26 (Criminal History I and a range of 63-78 months).[41]  Ms. Bucknor argued that the PSR should have properly calculated an offense level 22 (based upon a two-level reduction for the amount of loss and an additional two-level reduction concerning obstruction of justice, resulting in a range of 41-51 months) and asked for a probationary sentence based upon a number of factors including collateral impact from inability to practice law or teach in the future, extraordinary source of care and support for her family members, and her extraordinary life story.  The Court sentenced Ms. Bucknor to a non-custodial sentence of 3 years' probation for each count, to be served concurrently, with 36 months of home detention, and the agreed restitution.

In the matter of *United States v. Rodriguez*, Case No. 2:20-cr-00403-AB, Mr. Rodriguez pled guilty to a tax charge.[42]  While the government had recommended a sentencing of one year and one day in custody based largely on a general deterrence argument.   Mr. Rodriguez requested a probationary sentence, noting his future

---

[41] Per Court filings, Ms. Bucknor, a lawyer and teacher, was charged in connection to having embezzled federal funds in excess of $3.1 million, creating a fictitious entity and separate bank account to deposit the embezzled funds, and failing to report the income.

[42] Per Court filings, Mr. Rodriquez, for at least three years, engaged in a scheme to underpay his taxes by only depositing about half of his checks from his business into his business account, which was disclosed to his accountant, and then taking the other half, over $700,000, to a check cashing store to negotiate for cash which was hidden from his tax preparer.

compliance with the tax laws, his assistance to his elderly mother and fiancé, his community service, and that he had professional licenses related to his contractor business that were at risk due to the conviction. The Court sentenced Mr. Rodriquez to 3 years' probation with ten months of home detention; 500 hours of community service; a $10,000 fine and the agreed restitution.

Mr. Dayspring respectfully asserts that based on his substantial assistance to the Government in multiple ways, his sale of assets to ensure full payment of criminal restitution, and all mitigating factors and all other matters set forth herein, the imposition of a non-custodial sentence; specifically, a sentencing of 3 years' probation with substantial conditions as noted, including home confinement with electronic monitoring and 500 hours of community service, is appropriate and will not result in unwarranted sentence disparities.

## G. The Requested Non-custodial Sentence Would Provide Adequate Punishment as it is Sufficient, but Not Greater Than Necessary, to Comply With the Purposes Set Forth in § 3553(a)(2)

The Supreme Court in *Gall* took pains to point out that a sentence of probation constitutes significant punishment and involves "substantial restriction of [a defendant's] freedom." 128 S. Ct. at 595. The Court held:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty… . Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases, receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, and refrain from associating with any person convicted of a felony, [etc.].

Most probationers are also subject to individual "special conditions" imposed by the Court.

*Id*. at 595-96.

Mr. Dayspring poses no risk of re-offense. Apart from his own demonstrated commitment, all relevant statistics confirm that he is highly unlikely to recidivate. Specifically, the U.S. Sentencing Commission has found that first offenders with zero criminal history points, like Mr. Dayspring, are statistically the least likely to re-offend. U.S. Sentencing Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders (2017), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/2017/20170309_Recidivism-CH.pdf

Mr. Dayspring has demonstrated full acceptance of responsibility and remorse for the offenses that he committed and does not pose a threat to the public.

### H.  Substantial Community Service Should be Imposed

In short, in fashioning an appropriate sentence, the Court must consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant. 18 U.S.C. §3553(a)(2).  In Mr. Dayspring's case, taking into account the other severe consequences and penalties he has and will endure as a result of his conviction, all these purposes may properly be served by a non-custodial sentence, which includes home detention, counseling, and substantial community service of 500 hours.

### IX.    CONCLUSION

It has been said that if ever an individual should receive credit for good deeds he has accomplished and his criminal conduct assessed in the context of his life before and after the instant offense, it should be at the time he is sentenced, when his very future hangs in the balance.  This uncomplicated notion of weighing the good with the

bad was clearly what Congress contemplated when it directed courts to consider, as a necessary sentencing factor, the history and characteristics of the defendant.

Mr. Dayspring stands before this Court, to his unending regret and shame, having irreparably damaged his reputation with his family, his employees, and within his community.  Mr. Dayspring's conduct deserves punishment, but he also deserves compassion and a second chance.  In consideration of an appropriate sentence, take into account his entire life history, his cooperation with the FBI and IRS as well as the Department of Justice, the downward variance and departure recommendations of the U.S. Attorney's office, the downward variance recommendation of the U.S. Probation Office, the significant collateral consequences he has already faced, and for all the reasons set forth herein, Mr. Dayspring respectfully requests that the Court impose a three year probationary sentence, subject to home detention with a duration electronic monitoring as determined by the Court, 500 hours community service, a $200 mandatory special assessment, and such other terms and conditions as recommended or as the Court deems appropriate.  Such a sentence is "sufficient but not greater than necessary" to achieve the goals of sentencing Mr. Dayspring in this case.

Date:  May 16, 2022

Respectfully submitted:

HOCHMAN SALKIN TOSCHER PEREZ


By   /s/ Sandra R. Brown-Bodner
     SANDRA R. BROWN-BODNER

Attorney for Defendant
HELIOS RAPHAEL DAYSPRING